## JOHNSON ET UX *v*. ADOPTION OF INFANT JOHNSON BY ROBERT L. CUPP ET UX.

[No. 471A66. Filed October 26, 1971.]

*Donald J. Bolinger,* of Kokomo, for appellants.

*Fred G. Osborn, Hodson & Osborn, Daniel J. Gamble, Ellis & Gamble,* of Kokomo, for appellees.

ROBERTSON, J.—This is an appeal from an adoption proceeding wherein plaintiffs, Robert L. Cupp and Geraldine S. Cupp, petitioned the Howard Circuit Court for adoption of a child born September 26, 1967. Respondents, Jerry L. Johnson and Constance E. Johnson, the natural parents of the infant, filed objections to the adoption alleging the invalidity of consents signed by each of them. The trial court held the consents to be valid and granted the adoption to plaintiffs. Thereafter, respondents timely filed their Motion to Correct Errors which challenged the decision of the trial court as not supported by sufficient evidence, contrary to the evidence, and contrary to law. Said motion was denied, and respondents subsequently perfected this appeal.

A brief recitation of the uncontradicted relevant facts of this case is as follows; respondents are husband and wife; prior to the birth of their child, respondent, Jerry L. Johnson, signed an adoption consent form which was duly nota-

rized; subsequent to the birth of the respondents' child, respondent, Constance E. Johnson, who was at the time a minor, signed a consent form which was also duly notarized; the minor consent form of Constance E. Johnson was approved in writing by Ruth Dawson, a caseworker for the Howard County Welfare Department; the consent forms signed by the respective respondents did not specify the names of the adoptive parents, and were hence "blanket consents"; the Johnson infant was privately placed for adoption in the plaintiffs' home; the fitness of plaintiffs as adoptive parents was not contested.

The paramount issue presented by this appeal is whether or not the respective consents to adoption signed by each of the respondents are valid under Indiana law. The pertinent statute in force at the time the consents were executed was Ind. Ann. Stat. § 3-120 (Burns 1968)[1] which reads:

> "3.120. Consent of parent or parents—Abandoned or deserted child — Nonresident parents — Notice — Parents deprived of custody — Child over fourteen — Notice to known kindred.—If such child have parent or parents living, he, she or they shall consent in writing to such adoption. The minority of any parent shall not in or of itself be a bar to such consent: Provided, however, That if either parent be a minor, consent of such parent must be accompanied by the written approval of the investigating agency aforesaid if any there be and if none, of the state department of public welfare. Such consent of parent or parents may be dispensed with if such child is adjudged to have been abandoned or deserted for six [6] months or more immediately preceding the date of the filing of the petition. If it appears by indorsement on the petition and by the oath or affirmation of two [2] disinterested persons that such parent or parents or both are nonresidents or that their residence after diligent inquiry is unknown, then such parent or parents shall be notified of the pendency of

1. Ind. Ann. Stat. § 3-120 (Burns 1968) was completely rewritten and amended by the Acts of 1969 (Chapter 355), IC 1971, 31-3-1-6, Ind. Ann. Stat. § 3-120 (Burns 1970). The consents in the instant case were executed in 1967 prior to the 1969 amendment and this proceeding was tried under the prior law.

the action by publication as provided by law in civil cases. If the parent or parents have been legally deprived of their parental rights over such child for reasons other than economic, the written consent of such parent or parents shall not be necessary to such adoption and no notice of the pendency of such adoption proceedings to such parent or parents shall be necessary: Provided, however, That notice of the pendency of such adoption proceedings shall, in such case, be given to such agency or county department of public welfare of which such child may be a ward. In every case where such child shall have been born out of wedlock consent of the mother of such child shall be deemed sufficient, except that where the paternity of such child has been established by law and the father is adequately supporting such child, or where for any reason in the discretion of the court it is deemed advisable that he be heard, he shall have such notice as to the court seems necessary and opportunity to file his objection if any, and oppose such adoption, which objection shall be considered and determined by the court. If such child be fourteen [14] years of age or over, his consent shall be deemed necessary before adoption. In all cases where consent of the parent or parents is required such consent shall be signed in the presence of a duly authorized agent of the state department of public welfare or of such investigating agency and so attested by such agent; or by notary public: Provided, however, That such attestation shall not be necessary to the consents signed before and taking effect of this act [§§ 3-115—3-125]. Such state department is hereby authorized to furnish to clerks of courts as aforesaid prescribed forms for use by parents or other persons when giving consent. Copies of such consent when same have been signed shall be filed with the investigating agency aforesaid and with the clerk of the court in which the petition for adoption is pending. Such court may cause notice of hearing and opportunity to file objection to be given to the known kindred of the child and any other person or persons deemed entitled to such notice before granting such petition. In all cases where the father of any child or children has failed to pay any support money for a period of one [1] year immediately prior to the filing of adoption proceedings for the adoption of his child or children, the court may in its discretion not require the filing of a consent of the father in such instances. [Acts 1941, ch. 146, § 6, p. 438; 1943, ch. 40, § 5, p. 89.]"

As respondents correctly assert, the Indiana adoption statute is in derogation of the common law and must be strictly followed in all essential particulars in order to defeat the natural parents' right of custody of their children.

*In Re Adoption of Chaney, Devlin, et al.* v. *Chaney et al.* (1958), 128 Ind. App. 603, 150 N. E. 2d 754. *Rhodes et al.* v. *Shirley et al.* (1955), 234 Ind. 587, 129 N. E. 2d 60. *Emmons* v. *Dinelli* (1956), 235 Ind. 249, 133 N. E. 2d 56.

Respondents further contend, and correctly so, that petitioners or persons seeking to adopt a minor child have the burden of proving strict compliance with all particular essentials of the adoption statute.

*In Re Adoption of Bryant* v. *Kurtz et al.* (1963), 134 Ind. App. 480, 189 N. E. 2d 593.

In the instant case, it was incumbent upon petitioners to prove that the consents obtained from respondents were in strict compliance with the statutory requirements of the Indiana adoption statute, *supra*. From a literal reading of that statute, it is evident that in order for the consents to be statutorily valid, it must be shown that: they were in writing; that they were attested to by an agent of the public welfare department or notary public; and that if either parent, as in the present case, be a minor, then the consent must be accompanied by the written approval of the investigating agency or department of welfare. From an examination of the record in this appeal, we fail to find any refutation of the petitioners' proof that the consents satisfied the particular essentials of the statute. In accordance with the foregoing, we must hold that the trial court's decision was supported by sufficient evidence and was not contrary to the evidence.

In alleging that the trial court's decision was contrary to law, it would seem upon examination of the arguments set forth in respondents' brief, that respondents challenge the

validity of the consents in controversy not for their failure to satisfy the literal requirements of the statute, but rather for their failure to satisfy the statutory requirements as respondents contend they should be interpreted. Their first such contention argues that under the Indiana adoption statute a consent given prior to the birth of the infant to be adopted is not valid. While Burns 3-120 makes no mention of the validity of a consent obtained prior to the birth of a child, respondents contend that the language of the statute is subject only to the interpretation that such a consent is a nullity. Respondents specifically refer to two sentences in the statute which set forth: "If such child have parent or parents living, he, she or they shall consent in writing to such adoption." And, "In every case where such child shall have been born out of wedlock. . . ."

It is clear from a careful reading of the statute that it only requires that if the parents are living they must consent in writing to the adoption. We find no direct or indirect reference to the time of the consent in relationship to the birth of the child which would merit the interpretation that the right of custody by consent to adoption can only be given after the birth of the child.

Respondents cite no authority for this interpretation, and while no Indiana court decision directly on point can be found, petitioners have provided us with the case of *In Re Adoption of Long* (1952), Fla., 56 So. 2d 450, in support of the contrary interpretation, wherein the Florida Supreme Court stated, at p. 451:

> "We cannot agree that the consent agreement, because signed before the birth, was so premature as to be inconsistent with the statutory provision that such a consent be executed by 'the living mother of a child born out of wedlock * * *.' It seems to us that this construction emphasized too much the form and too little the purpose. As we have seen, the welfare of the child has been adequately protected."

In further support of respondents' interpretation that a consent given prior to birth is a nullity, it is argued that the legislature has since amended the prior statute to require execution of the consent after the birth of the child, and in so doing the legislature was merely incorporating into the statute in specific language what had always been the law of the state. We cannot agree and are bound to follow the more logical reasoning that the legislature by amending the statute was not acting to more specifically state the law as it had been in the past, but rather was acting to change the law to what it presently is. While the present adoption statute may indeed be superior to the former, we are nonetheless compelled to decide this appeal under the prior controlling law. Thus, absent express statutory provision or judicial interpretation to the contrary, the consent signed by respondent Jerry L. Johnson, was not invalid for the reason that it was signed prior to the birth of the child.

Respondents further contend that a "blanket consent" which makes no reference to the adoptive parents in the case of a private placement is not a valid consent. While the controlling statute is silent on the point in issue, and the courts of this state have not been directly confronted with this question, respondents argue that *Rhodes et al.* v. *Shirley et al.*, (1955), 234 Ind. 587, 129 N.E. 2d 60, stands for the proposition that a consent which fails to state the names of the adoptive parents is valid only where the child is placed in the custody of the department of public welfare. We fail to find any language, either expressed or implied, in the *Rhodes, supra,* decision which supports respondents' proposition. In the *Rhodes case,* it was held that where the natural parents had signed consents to adoption, and had placed their child in the custody of the welfare department for selection of a suitable adoptive home, the validity of the consents would not be defeated for their failure to state the names of the adoptive parents. The question of the effect of a private placement on the validity of a blanket consent was

not before the court, and rightfully so that question was not discussed. It was, nonetheless, reasoned in *Rhodes* that since the welfare department had control over the selection and supervision of a suitable adoptive home, and that since the ultimate responsibility of granting or denying the adoption was with the trial court, that allowing the blanket consents was not inconsistent with adoption procedures as practiced in this state. From such reasoning there may exist the inference that because the welfare department does not exercise the same degree of control over a private placement adoption as it does over a public placement adoption, the use of blanket consents is less desirable in the former than in the latter. However, to hold, as respondents would have us do, that *Rhodes* stands for the proposition that a consent which fails to state the names of the adoptive parents is only valid where the adoption is by public placement, would be to read into the court's decision something which simply is not there. Furthermore, it should be pointed out that while it is arguably preferable that blanket consents be used only in public placement adoptions, there, nonetheless, exists in private placement adoptions the necessary degree of control by the welfare department, and ultimately by the court, in order to protect the rights of the natural parents, and to reasonably insure that the use of blanket consents does not result in the child being adopted by unsuitable parents. As in the case where a child is placed for adoption in a home by a public agency, in a private placement adoption the ultimate responsibility still rests with the court, aided by the investigation and reports resulting therefrom of the public agency, to, upon determination of the facts and issues of the case, deny or grant the adoption.

In their brief, respondents state that it is significant that the 1969 Legislature, in enacting the present adoption statute, specifically provided in the section dealing with consents, that:

"A consent which does not name or otherwise identify the adoptive parents is valid if the consent contains a statement by the person whose consent it is, that the person consenting voluntarily executed the consent without disclosure of the name or other identification of the adopting parent." IC 1971, 31-3-1-6, Ind. Ann. Stat. 3-120 (a) 6c (Burns 1970).

We cannot agree with respondents' conclusion that prior to the enactment of the present amended statute, that such a consent was not valid unless shown to have been given to the department of public welfare. We find nothing in the cases cited by respondent, or in the statute in effect at the time these consents were executed, which would compel such a conclusion. Since the pertinent section in the statute does not distinguish between adoption cases involving private and public placements, the more reasonable conclusion, we feel, is that a blanket consent in a private placement adoption remains valid in Indiana, but with the recently added safeguard that the natural parents, in addition to consenting in writing to the adoption, must also file a statement that the consent was voluntarily executed without knowledge of the identity of the adoptive parents.

While respondents have not cited any cases in which other jurisdictions have held blanket consents to be invalid in private placement adoptions, they have, nonetheless, referred us to 2 Am. Jur. 2d 895, and 24 A.L.R. 2d 1138, which indicate that other jurisdictions have so held. The cases cited in the above mentioned annotations have held blanket consents to be invalid for the reasons that: (1) they are against public policy; (2) the consents must be given in or with reference to specific proceedings. The second reason, namely that the consent must be given in or with reference to specific proceedings, is not of significance here, since neither our adoption statutes, present or past, nor the courts of the state, have required that consents to be given must be in reference to specific proceedings. In *Barwin* v. *Reidy*

(1957), 62 N. M. 183, 194, 307 P. 2d 175, 182, the Supreme Court of New Mexico, confronted with a factual situation of striking similarity of that of the instant case, dealt with the issue of public policy as follows:

"[12] We are aware of no other statutes or decisions of this Court which may be the basis for the declaration of public policy in this consideration and we are unable to conclude that public policy was violated in the execution of the consents before us.

"We are told that the weight of authority is that blanket consents are void, either by statute, or as violative of public policy, and are referred to an annotation covering the subject in 24 A.L.R. 2d at page 1129, where we find analysis of cases from Pennsylvania and North Carolina. In addition, counsel for the natural parents cite to the same effect Sears v. Davis, Tex. Civ. App., 19 S.W. 2d 159.

"After examining the cases, we do not think the weight of authority, if such it is, is so formidable as to preclude an independent determination and conclusion to the contrary by this court. Of interest in this connection are the cases: Rhodes v. Shirley, 234 Ind. 587, 129 N.E.2d 60; Lee v. Thomas, 297 Ky. 858, 181 S.W.2d 457; and Adoption of Capparelli, 180 Or. 41, 175 P.2d 153."

As in *Barwin, supra,* this Court is unaware of any statutes or court decisions of this state which have declared blanket consents in private adoptions to be against public policy. To the contrary, the legislature has expressly provided in the present amended statute for blanket consents without distinction between private and public placement.

Of further interest in *Barwin, supra,* is the Court's reasoning, and we feel it to be sound and applicable to the instant case, regarding the legislative intent underlying the adoption statute.

"[6] Since adoption may be refused to petitioners who have the strongest endorsement of the parents, we think it follows that the office of the requirement of consent for adoption is to indicate the willingness of the parents that the natural relationship be swept away and a new one created in its stead. The giving of consent is indicative of

the subjective state of mind of the parents—expressive only of the individuals and binding no one unless the court shall choose to act thereon. It is up to the court to perform the objective acts of severing the natural relationship and creating an artificial status by judicial determination. *As it may or may not decree adoption in favor of persons recommended by the natural parents, it seems most unlikely the legislature intended to impose as a condition to the exercise of the court's jurisdiction knowledge of the identity of petitioners in adoption on the part of the natural parents, because even when that circumstance exists, and possibly the further circumstance that the natural parents have investigated the qualifications of the petitioners and given them their unqialified approval, the court may still refuse to decree adoption, the selection of a foster parent being a judicial act and the responsibility being that of the court."* (Emphasis added).

62 N.M. 183, 191, 307 P.2d 175, 181.

It is also significant, respondents' cited annotations notwithstanding, that other jurisdictions besides New Mexico in *Barwin, supra,* have held blanket consents in private adoption to be valid.

*Cohen* v. *Janic* (1965), 57 Ill. App. 2d 309, 207 N. E. 2d 89. *McKinney* v. *Weeks* (1961), Fla., 130 So. 2d 310. *In Re Adoption of a Minor Child,* 127 F. Supp. 256 (D.D.C. 1954).

For the foregoing reasons, the trial court's finding that the respective consents signed by the respondents were valid was not contrary to law. Furthermore, having found the consents to be valid, the trial court did not err in applying the "best interests" of the child rule.

There being no reversible error, the judgment of the trial court is affirmed.

Sullivan, P. J., and Lowdermilk, J. concur.

Buchanan, J., dissents with opinion.

## Dissenting Opinion

Buchanan, J.—I respectfully but unhesitatingly dissent from the majority opinion on these grounds:

1. The consents to adoption executed by the natural parents were invalid because they were:
   (a) executed prior to the child's birth (father only), and
   (b) executed in blank.
2. These consents are nullities. At best they indicate an intention to consent to adoption.

*Ground 1(a).* A consent to adoption executed prior to the birth of the child is void for various reasons.

First, the majority opinion does not *strictly* construe our adoption statute, Ind. Ann. Stat. § 3-120 (1968 Repl.), as it purports to do, as required by Indiana law. *In the Matter of the Adoption of Bryant* (1963), 134 Ind. App. 480, 189 N. E. 2d 593, 1 Ind. Dec. 298; *In Re Adoption of Chaney* (1958), 128 Ind. App. 603, 150 N. E. 2d 754; *In the Matter of Adoption of Force* (1956), 126 Ind. App. 156, 131 N. E. 2d 56. In pertinent part, our statute is worded in a manner evincing legislative intent that a *child* must be *born* before consent can be given, *i.e.,* "If such child *have* parent or parents living. . . ." "In every case where such *child shall have been born* out of wedlock. . . ." Ind. Ann. Stat. § 3-120 (1968 Repl.). (Emphasis supplied.) The majority interprets this language as only requiring the parents' consent if they are living. However, if the parents are not living, then there can be no child, unless he has already been born.

Strict construction means a literal reading of words as they outwardly appear. It does not mean reading something into the language which is not there. *Lagler* v. *Bye* (1908), 42 Ind. App. 592, 596, 85 N. E. 36; 50 Am. Jur. *Statutes* § 388.

The majority finds no direct or indirect reference to the time of consent in this statute. However, this is not a strict, literal reading because they failed to consider the effect of the words "child", "have", and "shall have been born". Such words speak of a human being in existence, not a fetus. Ac-

cordingly, the word "child" has been defined to be an immediate offspring of human parents. *Houston* v. *McKinney*, 54 Fla. 600, 45 So. 480; *Matter of Conant's Estate* (1932), 144 Misc. 743, 259 N.Y. Supp. 885.

Another reason a consent prior to birth is invalid is that it is vague, uncertain, and inevitably leads to confusion. There is the ever-present possibility that the child may be stillborn, defective, or there may be a multiple birth. Various questions come to mind. Have the natural parents consented to adoption of all the babies if there is a multiple birth? If not, what would become of the remaining baby or babies? What if the adopting parents die before the birth of the child?

The majority cites a Florida case holding a consent prior to birth as valid because of the welfare of the child was adequately protected. *In Re Adoption of Long* (1952), 56 So. 2d 450. Query—how can a child's welfare be protected in view of these uncertainties?

Finally, such consents fail to allow for one of nature's strongest instincts. Who knows what the reaction will be of a mother once she sees *her* baby? Does the view of the majority that such a consent is valid allow for maternal instinct? To deny the mother's natural desire to keep her baby is in derogation of the purpose of our statute to preserve the natural family relationship to the fullest extent possible. *In the Matter of the Adoption of Bryant* (1963), *supra; Duckworth* v. *Duckworth* (1932), 203 Ind. 276, 179 N. E. 773.

It can safely be said such consents are premature.

*Ground 1(b)*. The execution of a blanket consent in a private adoption is inconsistent with the duty of the natural parents to select the most suitable foster parents for their child.

Because it was their act which brought the child into the world, they must bear this responsibility. Without full knowledge of the adopting parents' identity, their home life, financial condition, character, etc., they do not discharge this

responsibility. They merely evade it by executing a "blank check".

The majority contends that although blanket consents in private adoptions allow the natural parents to evade performance of their duty to place the child in a proper foster home, there still exists the necessary degree of control exercised by the court and the welfare department in assuming the natural parents' role. In response thereto, it may be observed that the press of other responsibilities often makes investigations as to the suitability of private adoptions perfunctory.

In support of the argument that blanket consents are invalid is *In Re Holder* (1940), 218 N. C. 136, 141, 10 S. E. 2d 628:

> "The consent must at least be in fair contemplation of the proposed adoption, and this includes *its most essential feature—the identity of the adoptive parents. . . . Jurisdiction of the court cannot be made to depend upon a blanket release* or consent on the part of the parent that the child may be adopted in whatsoever proceeding may be brought and to whomsoever it may apply." (Emphasis supplied.)

See also 2 Am. Jur. *Adoption* § 45; 24 A. L. R. 2d 1138, § 7.

Here, as in the consent prior to birth question, the majority grounds its decision on the fact that the 1969 General Assembly amended Burns § 3-120 and endorsed blanket consents, since the previous statute made no mention of the subject. They assert that this amendment was merely restating the previous law by putting it in writing and adding a safeguard. However, is it not just as logical to argue the converse?

Some interesting analogies come to mind. Deeds and other instruments affecting title or an interest in real estate must be properly filled in before they are accepted for recording and thereby give effective notice to all concerned. *Wilson* v. *Johnson* (1895), 145 Ind. 40, 38 N. E. 38. A lien on personal property does not become effective to the world until properly

filed. UCC §§ 9-401 *et seq.* Daily, governmental offices refuse various instruments for filing which do not have all the blanks filled in.

We provide safeguards for instruments which affect property and other aspects of life as we lead it today. What safeguards have we provided for human life in adopting the majority view that a blank check may be written by natural parents of a child not yet in existence?

In times gone by, and even today, those knowledgeable in the field of private adoptions are aware that a certain amount of "trafficking in human flesh" exists. Sometimes this is referred to as a black or gray market in babies. Legislation in recent years has done much to rectify this vicious traffic. Without delving into the details of how this is done, suffice it to say that the kind of consents under attack here aid and abet placement of newborn children where the paramount consideration is money, not the welfare of the child.

*Ground 2.* A blank consent executed prior to birth is a nullity. At best it is only an *indication* of an intent to consent to adoption which is not binding and may be withdrawn at any time prior to final judgment by the court having jurisdiction. *In Re White,* 300 Mich. 378, 1 N. W. 2d 579, 138 A. L. R. 1034; *In Re Adoption of Lauless,* 216 Ore. 188, 388 P. 2d 660.

The Cupps testified to realizing that when one takes a child into his home, there can be no final adoption until the court approves it. Before this final approval was given, the natural parents changed their intention, an action they rightfully took as their consents were invalid or only indicative of intent to consent.

Authority is meager, both in Indiana and elsewhere, as to the validity of consents, but the approach to this subject is perhaps best summarized by *In the Matter of the Adoption of Bryant, supra,* at 301:

"[S]ince *the relationship between a parent and a child is a bundle of human rights of such fundamental importance,*

it has generally been held that adoption statutes being in derogation of the common law should be strictly construed in favor of a worthy parent and the preservation of such relationship. Therefore the rules in the above paragraph need be tempered by the rule that *neither should the statute be so liberally construed that it would destroy safeguards erected for preservation of family relationships.*" (Emphasis supplied.)

Has human life become so insignificant that we lightly set a child adrift with fewer safeguards for its protection than we prescribe for a chattel?

The net effect of the majority opinion is to prevent a natural parent from repudiating a "consent" executed in blank prior to the birth of the child, and at any time after the child is born, even befor a final adoption decree has been entered. Such a result is contrary to a strict interpretation of Ind. Ann. Stat. § 3-120, *supra,* and the public policy of this and other states concerned with the paramount importance of the welfare of the child.

Therefore the decision of the trial court should be reversed.

NOTE.—Reported in 274 N. E. 2d 411.