**In the Matter of the ADOPTION OF Christopher Ryan TOPEL.**

**Terry Lynn TOPEL and Melissa Topel, Appellants,**

v.

**Robert Lee MILES, Jr. and Anita Kay Miles, Appellees.**

**No. 34A02–9007–CV–392 [1].**

Court of Appeals of Indiana, First District.

May 28, 1991.

**1.** This case was reassigned to this office on May 3, 1991.

Russell T. Clarke, Jr., Emswiller, Williams, Noland & Clarke, Indianapolis, for appellants.

Richard L. Russell, Russell, McIntyre, Jessup, Hilligoss & Raquet, Kokomo, for appellees.

ROBERTSON, Judge.

The natural parents of Christopher Ryan Topel, Terry Lynn and Melissa Topel, bring this interlocutory appeal in the proceedings initiated by Robert Lee Miles, Jr. and Anita Kay Miles for Christopher's adoption. The Topels assert the trial court erred in denying their petition for the withdrawal of their consents to the adoption and the termination of their parental rights. The Topels raise three issues; but, because one mandates that we reverse, we address it only. Restated, it is: whether the trial court's determination that Terry's [the natural father's] consent was valid is contrary to law?

## FACTS

The pertinent facts are entirely undisputed and are dispositive of this appeal. Christopher, the child who is the subject of these proceedings, was born on July 7, 1988. Christopher was conceived before, and born after, the dissolution of the marriage of his natural parents, Terry and Melissa Topel.

Robert and Anita Miles seek to adopt Christopher. They are Melissa Topel's brother and sister-in-law. Christopher has been in the Miles' care since approximately three weeks after his birth.

On February 28, 1989, Terry signed a document entitled "Consent To Adoption and Termination of Parental Rights." Through this document, Terry purported to give his consent to the Miles' adoption of Christopher and to the termination of his parental rights regarding Christopher. However, on the same day, the Miles executed a document (drafted by Anita Miles) entitled "Visitation Agreement." This "Visitation Agreement" reads as follows:

Robert Lee Miles Jr. & Anita Kay Miles, husband and wife, being adoptive parents of Christopher Topel Miles do hereby grant visitation rights to Terry Lynn Topel. Terry Lynn Topel is guaranteed visitation with Christopher Topel Miles every other weekend.

We have adopted this child out of love; therefore, we will do our best to provide him with a happy, healthy environment in which to grow.

Terry enjoyed visitation privileges with Christopher pursuant to this agreement until August of 1989.

On May 9, 1989, Melissa signed a "Consent To Adoption and Termination of Parental Rights" which was almost identical to the one signed by Terry. At the time she executed her consent, she was aware of the "Visitation Agreement" set out above and was aware that Terry was exercising visitation privileges with Christopher.

On May 10, 1989, the Miles filed the present "Petition For Adoption And Termination Of Parental Rights." The Topels' written consents were attached to the petition. The "Visitation Agreement" was not. The Topels were not served with the petition for adoption.

In August 1989, Terry was informed by Anita Miles that the visitation arrangement was not working out. She hand delivered a letter to Terry which—in effect—offered him two options: 1) he could have Christopher back upon payment of approximately $3,000.00 (as reimbursement for the expenses incurred by the Miles in caring for Christopher), or 2) the Miles would go through with the adoption and Terry would no longer be allowed visitation privileges with Christopher.

At this point, Terry sought legal counsel for the first time. On August 10, 1989, both Terry and Melissa filed petitions in the present adoption proceedings styled "Withdrawal of Consent To Adoption and Termination Of Parental Rights." Terry alleged in his petition that he was seeking custody of Christopher. Melissa alleged in her petition that she approved and supported Terry in his cause to secure custody of Christopher.

The trial court held an evidentiary hearing on the matter and denied the Topels' petitions to withdraw their consents. In its order, the trial court gave its reasoning for upholding the validity of the consents stating that it did not find "any fraud or misrepresentation of the actual facts at the time the consents were signed." The Topels bring this appeal.

## DECISION

 The right to raise one's child is an essential and basic right more precious than property rights and is within the protection of the Fourteenth Amendment to the United States Constitution. *In the Matter of the Adoption of Hewitt* (1979), Ind.App., 396 N.E.2d 938. Indiana's statutes governing adoptions should not be so liberally construed that safeguards erected for the preservation of family relationships are destroyed. *In re Bryant's Adoption* (1963), 134 Ind.App. 480, 189 N.E.2d 593. A decree of adoption severs forever every part of the parent/child relationship. *Id.* The child is severed entirely from its own family tree and engrafted upon another. *Id.* For all legal and practical purposes, an adopted child is the same as dead to its parents. *Id. The parents lose the right to ever see the child again. Id.*

 Except under circumstances not present in the case at bar, a petition to adopt a child under the age of eighteen (18) may not be granted unless a written consent to the adoption has been executed by each living parent. IND.CODE 31-3-1-6.[2] For the execution of a parent's consent to the adoption of his or her child to be valid, the consent must be voluntary. *Hewitt,* 396 N.E.2d 938. A parent's consent to an adoption is voluntary if it is an act of the parent's own volition, free from duress, fraud, *or any other consent-vitiating factor, and if it is made with knowledge of the essential facts. Id.* A parent's consent to an adoption does not exist when it is obtained through fraud, duress, or any other consent-vitiating factor, and an adoption obtained with an invalid consent is subject to attack. *Id.*

 The issue of an invalid consent may be raised in adoption proceedings by the intervention of the natural parent or by a petition to withdraw consent. *Id.* The burden of proof in such a matter falls on the natural parent/intervenor or petitioner. *Id.* The natural parent challenging an adoption court's finding that consent was valid and voluntary appeals a negative judgment. *Id.* In such a case—as the one at bar, we will not reverse the trial court's finding that consent was voluntary unless the finding is contrary to law. *Id.* That is, we will not reverse unless the evidence at trial leads to but one conclusion and the trial court reached the opposite conclusion. *Id.*

**2.** The Miles assert that Terry is merely the putative father of a child born out of wedlock whose paternity has not been established by a court proceeding other than the adoption proceedings. Therefore, the Miles argue, Terry's consent is unnecessary for their adoption of Christopher, citing IND.CODE 31-3-1-6(g)(2)(A); *M.R. by Ratcliff v. Meltzer* (1986), Ind.App., 487 N.E.2d 836, *trans. denied.*

We relegate the discussion of this matter to a footnote because it is devoid of merit for several reasons. First, the Miles raise this argument for the first time in their brief. However, even now they do not dispute Christopher's paternity and have continuously recognized Terry as Christopher's natural father before and during the course of these proceedings. The Miles alleged that Terry is Christopher's natural father in their verified petition for adoption and termination of parental rights. Second, the Miles

acknowledge in their brief that the paternity of Christopher has been established by a paternity order entered May 3, 1990 in a separate matter. While this order has not been made a part of the record of these proceedings, the Miles do not even intimate that the order establishes the paternity of Christopher in any person other than Terry. Finally, we do not believe that Christopher was born out of wedlock. We are aware of no definition of the term "born out of wedlock" under Indiana law. Christopher was conceived during Terry's and Melissa's marriage and born after their divorce. We agree with the only authority we have found on this subject: a New York court that held a child conceived during the marriage but born after the parents' divorce is "legitimate" and "born in wedlock." *People ex rel. Anonymous v. Saratoga County Dept. of Social Services* (1968), 55 Misc.2d 761, 286 N.Y.S.2d 697, 703.

We have no doubt that the Miles as Christopher's would-be adoptive parents have continuously bestowed their love upon Christopher throughout his life and have acted purely out of their love for Christopher throughout these proceedings. We have no doubt that the trial court's finding of an absence of fraud or misrepresentation in the transactions underlying these proceedings is correct. Finally, we have no doubt that the trial court made its decision with Christopher's best interests as the paramount concern.

Nevertheless, we hold the "Visitation Agreement" in favor of Terry executed contemporaneously with his consent to the adoption and the termination of his parental rights constitutes a consent-vitiating factor which renders his consent invalid. Indiana has long recognized that the right of a parent to visit his child is a 'a sacred and precious privilege.' *Stewart v. Stewart* (1988), Ind.App., 521 N.E.2d 956, 960, *trans. denied.* We believe it is simply impossible for one to validly consent to the termination of all his parental rights; when, at the same time, he retains the right to exercise visitation privileges with that child. We hold that—as a matter of law—"consent" under such circumstances does not exist. *Hewitt,* 396 N.E.2d 938.

We believe it is obvious that Terry has never consented to the termination of *all* his parental rights. He has never relinquished the right of visitation with Christopher. Similarly, we believe it is obvious that Terry was not aware of all the essential facts involved in giving his consent to the adoption and the termination of his parental rights. Specifically, it is obvious that Terry was not aware of the fact that his consent would terminate his legal right to ever see Christopher again. The Miles had—by written contract—"guaranteed" Terry the right of visitation with Christopher.

We hold that Terry has met his burden in upsetting a negative judgment because the undisputed evidence presented at the hearing below leads unerringly to the conclusion opposite the one reached by the trial court. We hold that Terry's consent to Christopher's adoption is invalid as a matter of law.[3] Therefore, we reverse and remand for proceedings consistent with this decision.

Judgment reversed.

RATLIFF, C.J., and BUCHANAN, J., concur.

---

3. Christopher's natural mother, Melissa, argues that her consent is also invalid. But, as the consent of both parents is essential to Christopher's adoption, I.C. 31–3–1–6, we need not analyze the validity of Melissa's consent.